# EXHIBIT A

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

| | |
|---|---|
| BRUCE BAIR, KRISTINE BAIR,<br>JOHN YOUNG, and PAULA YOUNG,<br>on behalf of themselves and all others<br>similarly situated,<br><br>   Plaintiffs,<br><br>v.<br><br>V2V HOLDINGS, LLC, VERTRUE, LLC,<br>ADAPTIVE MARKETING, LLC, and<br>VELO ACU, LLC,<br><br>   Defendants. | CIVIL ACTION<br><br>FILE NO.: 2015CV257139 |

## NOTICE OF LAWSUIT AND REQUEST FOR
## WAIVER OF SERVICE OF SUMMONS

TO: Ana Alfonso, Esq.
   Willkie Farr & Gallagher LLP
   787 Seventh Avenue
   New York, NY 10019-6099

A lawsuit has been commenced against V2V HOLDINGS, LLC, VERTRUE, LLC,

ADAPTIVE MARKETING, LLC, and VELO ACU, LLC (on whose behalf you are addressed).

A copy of the Class Action Complaint is attached to this Notice.  It has been filed in the Fulton

County Superior Court and has been assigned case number 2015CV257139.

This is not a formal summons or notification from the Court, but rather my request that

you sign and return the enclosed Waiver of Service in order to save the cost of serving your

clients with a judicial summons and an additional copies of the Class Action Complaint.  The

cost of service will be avoided if I receive from you a signed copy of the Waiver within 30 days

after the date on which this Notice and Request was sent.  I enclose a stamped and addressed

envelope for your use. An extra copy of the Waiver is also attached, for your records (see Defendants' copy).

If you comply with this request and return the signed Waiver, it will be filed with the Court and no summons will be served on you. The action will then proceed as if you had been served on the date the Waiver is filed, except that you will not be obligated to answer the Complaint before 60 days from the date designated below as the date on which this Notice is sent.

If you do not return the signed Waiver within the time indicated, I will take appropriate steps to effect formal service in a manner authorized by the Georgia Civil Practice Act and will then, to the extent authorized by such Act, ask the Court to require your clients to pay the full costs of such service. In that connection, please read the statement concerning the duty of parties to waive the service of the summons, which is set forth at the foot of the Waiver form.

I affirm that this request is being sent to you on behalf of the Plaintiffs, this 17th day of February, 2015.

BY:      WEBB, KLASE & LEMOND, LLC


E. Adam Webb
  Georgia State Bar No. 743910
Matthew C. Klase
  Georgia State Bar No. 141903

1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
(770) 217-9950 (fax)
Adam@WebbLLC.com
Matt@WebbLLC.com

Attorneys for Plaintiffs

## WAIVER OF SERVICE OF SUMMONS (Defendants' copy)

TO:  E. Adam Webb, Attorney for Plaintiff

  I acknowledge receipt of your request that I waive service of summons in the action of <u>Bruce Bair, et al. v. V2V Holdings, LLC, et al.</u>, which was filed in the Fulton County Superior Court and assigned Civil Action File No. 2015CV257139.  I have also received a copy of the Class Action Complaint in this action, two copies of this instrument, and a means by which I can return the signed Waiver to you without cost to me or my client.

  I agree to save the cost of serving a summons and an additional copy of the Complaint in this lawsuit by not requiring that Defendants be served with judicial process in the manner provided by O.C.G.A. § 9-11-4.

  Defendants will retain all defenses or objections to the lawsuit or to the jurisdiction or venue of the Court, except for objections based on a defect in the summons or in the service of the summons.

  I understand that a judgment may be entered against the parties on whose behalf I am acting if an answer or motion under O.C.G.A. § 9-11-12 is not served upon you within 60 days after February 17, 2015.

Date:  _____

Signature: _____
    Attorney for V2V Holdings, LLC, Vertrue, LLC,
    Adaptive Marketing, LLC, and Velo ACU, LLC

## Duty to Avoid Unnecessary Costs of Service of Summons

  O.C.G.A. § 9-11-4 of the Georgia Civil Practice Act requires certain parties to cooperate in saving unnecessary costs of serving the summons and complaint.

  All defendants, after being notified of an action and asked by a plaintiff to waive service of a summons, who fail to do so, will be required to bear the cost of such service, unless good cause be shown for their failure to sign and return the waiver.

  It is not good cause for a failure to waive service that a party believes that the complaint is unfounded, or that the action has been brought in an improper place, or in a court that lacks jurisdiction over the subject matter of the action, or over its person or property.

  A party who waives service of the summons retains all defenses and objections (except any relating to the summons or to the service of the summons), and may later object to the jurisdiction of the Court, or to the place where the action has been brought.

  Defendants who waive service <u>must</u>, within the time specified on the waiver form, serve on the plaintiff a response to the complaint (e.g. answer or motion), and must also file a signed copy of their response with the Court.

  If a response is not served within this time, a default judgment may be taken against that defendant.

  By waiving service, a defendant is allowed more time to respond than if the summons had been actually served when the request for waiver of service was received.

## WAIVER OF SERVICE OF SUMMONS (Plaintiffs' copy)

TO:  E. Adam Webb, Attorney for Plaintiff

      I acknowledge receipt of your request that I waive service of summons in the action of Bruce Bair, et al. v. V2V Holdings, LLC, et al., which was filed in the Fulton County Superior Court and assigned Civil Action File No. 2015CV257139.  I have also received a copy of the Class Action Complaint in this action, two copies of this instrument, and a means by which I can return the signed Waiver to you without cost to me or my client.

      I agree to save the cost of serving a summons and an additional copy of the Complaint in this lawsuit by not requiring that Defendants be served with judicial process in the manner provided by O.C.G.A. § 9-11-4.

      Defendants will retain all defenses or objections to the lawsuit or to the jurisdiction or venue of the Court, except for objections based on a defect in the summons or in the service of the summons.

      I understand that a judgment may be entered against the parties on whose behalf I am acting if an answer or motion under O.C.G.A. § 9-11-12 is not served upon you within 60 days after February 17, 2015.

Date: _____

Signature: _____
                Attorney for V2V Holdings, LLC, Vertrue, LLC,
                Adaptive Marketing, LLC, and Velo ACU, LLC

### Duty to Avoid Unnecessary Costs of Service of Summons

      O.C.G.A. § 9-11-4 of the Georgia Civil Practice Act requires certain parties to cooperate in saving unnecessary costs of serving the summons and complaint.

      All defendants, after being notified of an action and asked by a plaintiff to waive service of a summons, who fail to do so, will be required to bear the cost of such service, unless good cause be shown for their failure to sign and return the waiver.

      It is not good cause for a failure to waive service that a party believes that the complaint is unfounded, or that the action has been brought in an improper place, or in a court that lacks jurisdiction over the subject matter of the action, or over its person or property.

      A party who waives service of the summons retains all defenses and objections (except any relating to the summons or to the service of the summons), and may later object to the jurisdiction of the Court, or to the place where the action has been brought.

      Defendants who waive service must, within the time specified on the waiver form, serve on the plaintiff a response to the complaint (e.g. answer or motion), and must also file a signed copy of their response with the Court.

      If a response is not served within this time, a default judgment may be taken against that defendant.

      By waiving service, a defendant is allowed more time to respond than if the summons had been actually served when the request for waiver of service was received.

$SCH$

## IN THE SUPERIOR COURT OF FULTON COUNTY
### STATE OF GEORGIA

BRUCE BAIR, KRISTINE BAIR,
JOHN YOUNG, and PAULA YOUNG,
on behalf of themselves and all others
similarly situated,

      Plaintiffs,

v.

V2V HOLDINGS, LLC, VERTRUE, LLC,
ADAPTIVE MARKETING, LLC, and
VELO ACU, LLC,

      Defendants.

**FILED IN OFFICE**

FEB 1 3 2015

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

CIVIL ACTION

FILE NO.: 2015CV257139

**JURY TRIAL DEMANDED**

### CLASS ACTION COMPLAINT

COME NOW Plaintiffs Bruce Bair, Kristine Bair, John Young, and Paula Young, by and through their attorneys of record, and file this Class Action Complaint on behalf of themselves and all others similarly situated. This pleading is based upon the current information and belief of Plaintiffs who hereby allege as follows:

### PARTIES

1.

Plaintiffs Bruce Bair and Kristine Bair are husband and wife and residents and citizens of the State of Texas.

2.

Plaintiffs James Young and Paula Young are husband and wife and residents and citizens of the State of Virginia.

3.

Defendant V2V Holdings, LLC is a limited liability company organized under the laws of Delaware with its principal place of business in Norwalk, Connecticut.  V2V is a holding company for several related entities, including Defendants Vertrue, LLC and Adaptive Marketing, LLC.

4.

Defendant Vertrue, LLC is a Delaware corporation with its principal place of business in Norwalk, Connecticut.  Vertrue is a wholly-owned subsidiary of V2V Holdings, LLC and an intermediate holding company of Adaptive Marketing, LLC.

5.

Defendant Adaptive Marketing, LLC is a limited liability company organized under the laws of Delaware with its principal place of business in Norwalk, Connecticut.  Adaptive Marketing, a wholly-owned subsidiary of Vertrue, operates a series of so-called "discount membership programs" including SavingsAce and Passport to Fun.

6.

Defendant Velo ACU, LLC is a limited liability company organized under the laws of Delaware that is owned by the secured creditors of the remaining Defendants.  ACU, LLC was created to receive any revenues generated by the remaining Defendants following their 2012 Chapter 11 bankruptcy petition.

2

## JURISDICTION AND VENUE

### 7.

Pursuant to O.C.G.A. § 9-10-91(1)-(3), Defendants are subject to the personal jurisdiction of this Court. Additionally, this Court, as a court of general jurisdiction, has subject matter jurisdiction over the claims raised herein.

### 8.

Pursuant to O.C.G.A. § 9-10-93, venue in this Court is proper because Defendants conduct business in Fulton County and the tortious acts and injuries of multiple members of the putative Class occurred in Fulton County.

## COMMON FACTUAL ALLEGATIONS

A.   Vertrue Tricked Consumers into Enrolling and Paying for Useless Membership Programs of Which They Were Not Even Aware.

### 9.

Defendants (collectively, "Vertrue") created numerous lifestyle and shopping-related membership programs which charge monthly fees, often of more than $20, for purported discounts at various merchants. These programs include, but are not limited to, At Home Rewards, At Home Rewards+, BusinessMax, Cross Country Savings, DealMax, Home Savings Mall, Food and Flix, Getaway and Save, Leisure Exclusives, My Great Deals, Passport to Fun, Passport to Fun+, SavingsAce, SavingSmart, Shopping Essentials, Shopping Essentials+, Simply You, Today's Escapes, Today's Escapes+, ValueMax, and Your Savings Club (collectively, "Membership Program(s)").

### 10.

Because there is no significant market, demand, or use for these Membership Programs, most of Vertrue's success is directly attributable to its ability to deceptively saddle consumers

3

with unauthorized charges for these programs, which consist of services that consumers do not request, authorize, or, in most instances, even realize exist. Most Vertrue members signed up for the services as a result of misleading and illegal methods of Defendants and their affiliates, have never used the services at all, and cancel their memberships immediately upon learning that their credit cards have been charged for a Membership Program for which they never intended to sign up.

11.

Vertrue's scheme to deceptively impose unauthorized charges was dependent upon a variety of strategic marketing partnerships with e-merchant third parties, including but not limited to such as Travelocity, Orbitz, Priceline.com, Buy.com, 1-800 Flowers, Classmates.com, MyLife.com, and Fandango (collectively "Vertrue Marketing Partner(s)"). These partnerships included arrangements to deceive consumers who had just made (or were in the process of making) an internet purchase from the e-merchant into "joining" Vertrue's Membership Programs.

12.

After online consumers "checked out," that is, began the process of purchasing goods and services from Vertrue's Marketing Partners, they encountered stealth offers for Vertrue's Membership Programs. These "post-transaction" offers, *inter alia*, took the form of (1) sales offer pages that appeared between the checkout page and the confirmation page while the customers were completing their transactions, (2) "pop up" windows with offers which appeared on top of the e-merchant's confirmation page, and (3) hyperlinks to enrollment offers that were included on the e-merchant's confirmation page.

4

13.

Vertrue intentionally created the false and deceptive appearance that these offers for discount Membership Programs were part of the consumers' transactions with the Vertrue Marketing Partners. Any opt-out hyperlinks or other "disclaimers" displayed by Vertrue used text that was the same color as the website background, or a color that was indistinguishably similar, in order to reduce the detectability and/or noticeability of such language. Frequently, consumers inadvertently "accepted" membership in these programs by clicking onto the next page without realizing what they had done.

14.

Further, the wording of these ads was vague and muddled by design. Offers were framed as "risk free," no-cost trial memberships, or cash back offers that they could benefit from by entering their email address. However, while accepting Vertrue's offers entailed recurring monthly fees of $20 or more, this fact was not at all apparent to the unwitting online consumer.

15.

If a consumer "opted," almost invariably by accident, to join a Vertrue Membership Program, the e-merchant relayed the consumer's credit card information to Vertrue via a method called "data pass." The "data pass" practice is particularly shocking because it allowed consumers' personal credit card information to be disseminated to other parties without their knowledge or consent.

16.

Because consumers did not provide credit card information directly to Vertrue, they reasonably believed that they had not made any additional purchases apart from their original transactions with the Vertrue Marketing Partners and could not imagine that their private credit

card information would be relayed to another online business that would charge them monthly fees for Memberships Programs they did not want.  However, Vertrue used this illicitly obtained financial data to make unauthorized, recurring charges on the consumers' credit and debit card accounts.

17.

Vertrue has contended that at some point it stopped using the data pass method and thereafter required potential customers to enter their credit card information in order to accept one of its membership "offers."   However, even assuming this to be true, Vertrue's advertisements remained profoundly misleading, with vague and muddled wording and key details regarding recurring monthly fees of $20 or more buried in fine print Vertrue knew most consumers would not read.

18.

Consumers were still easily fooled into believing that the Vertrue ads were part of the e-merchant checkout process even if the ads required them to enter some credit card or other information.   This likely confusion was exacerbated by the fact that the receipts for the consumers' actual, intended purchases did not include any reference to the Vertrue Membership Program.  Subsequent emails from Vertrue regarding the Membership Program transaction, if any were sent, were understandably discarded or ignored as spam.

19.

Vertrue exploited the fact that the consumers were completely unaware of their inadvertent enrollment in these Membership Programs, by uniformly employing a deceptive billing process known as "negative option" where the consumer's credit card is automatically charged a monthly fee unless the consumer takes affirmative steps to cancel the membership.

6

The only indication on the offer page that Vertrue engaged in such negative option billing process, if any, was in exceedingly fine print that was specifically designed not to attract the consumer's attention.

20.

Affirmative consumer action to terminate the "relationship" with Vertrue is impossible until consumers actually become aware that they have been enrolled in a Membership Program. The only way to do so is to discover unauthorized charges on debit or credit card statements. However, Vertrue intentionally labels its charges in such a manner that they do not trigger consumer suspicion. For example, many consumers believe their spouse or other joint card holder has signed up for a legitimate savings club or service. Vertrue craftily starts its billings at a price point that does not merit extensive research by a consumer (such as $19.95/month) but then raises the billing rate over time. These rate increases are imposed without any claim of consumer knowledge or authorization.

21.

Consequently, consumers passively accept Vertrue's monthly charges, believing them to be legitimate, and pay for unused services for months and even years before realizing the fraudulent nature of these charges.

22.

Although consumer debit and credit card information changes over time (i.e., when a card expires and a new card with the same or a different card number is issued), Vertrue does not obtain affirmative consent from consumers to continue charging their cards after such events. Given that most consumers have no idea they are being billed on a recurring basis in the first place, Vertrue knows that alerting them to this issue by requesting an authorization to charge the

7

new card would almost certainly trigger a cancellation request. As such, Vertrue implemented a way to transfer charges to the new card without contacting the consumer to obtain their new card information. Vertrue has engaged in this deceptive practice, as well as the monthly rate increases without any consumer authorization whatsoever, even after it emerged from bankruptcy.

23.

Vertrue is open about the reality that the vast majority of its club "members" do not know that they are paying for Vertrue's "services." For example, Vertrue runs a web site (accessible at "http://www.savingsace.com") containing a frequently asked questions list that addresses such issues as, "What is SavingsAce?".

24.

Although they have recently been removed from the website, the frequently asked questions list formerly answered questions such as "What does MVQ*SAVINGSACE mean, and why is it on my credit or debit card statement?," and "When or how did I enroll in SavingsAce?". Vertrue felt compelled to explain to its "customers" that they might have joined SavingsAce after "accept[ing] a promotional offer to try one of our cash-back or free shipping offers for a future purchase with one of our marketing partners" or "[a]fter [they] made a transaction from one of [Vertrue's] online partner's websites." Id.

25.

Clearly, a legitimate company has no need to put up a web site explaining to its existing "customers" what the company's services are, and why the customers are paying for them. Vertrue's "signup" procedures unquestionably induced an enormous number of consumers to "join" Vertrue's Membership Clubs unknowingly.

8

26.

When consumers eventually discover the charges and further learn they have previously paid charges on prior monthly statements, they are understandably upset and demand that the charges cease and that they be refunded for all past amounts.  Vertrue created scripts for its call center operators to follow that were intended to minimize the amount of money it would have to return to complaining customers who had unknowingly become enrolled in its Membership Programs.

27.

For consumers who insisted upon refunds, Vertrue employed a variety of tactics to keep the refund amounts as small as possible, including requiring customers to obtain refunds by submitting requests in writing.  However, when consumers mentioned the "magic words" such as "legal action," "lawsuit," or "attorney general investigation," Vertrue was willing to issue full refunds to appease such customers and avoid legal action.

B.    Vertrue's Illicit Practices Spawn Investigations by Congress and State Agencies.

28.

State attorneys general, courts, and even the United States Senate have investigated Vertrue's deceitful practices.

29.

In a 2012 settlement with the New York Attorney General, Vertrue agreed to refund $2 million to New York consumers who it had tricked into signing up for recurring Membership Program charges.

30.

In 2013, the Iowa Supreme Court upheld a lower court's ruling that Vertrue's practices violate Iowa's Buying Club Membership Law as well as Iowa's Consumer Fraud Act. State ex rel. Miller v. Vertrue, Inc., 834 N.W.2d 12, 45 (Iowa 2013).

31.

The Iowa Supreme Court observed that Vertrue's deceptive marketing practices disproportionately harmed the elderly. "[T]the State's calculations demonstrated that persons aged sixty-five or older constituted 50% of all Iowa members that were billed" by Vertrue "ninety or more times without ever using program benefits.   Clearly, the elderly were overrepresented in these statistical populations." Id. at 44.   In discussing a Vertrue program, the Court observed that "figures demonstrated that persons over the age of sixty-five were among the most likely to enroll in the program and among the least likely to use the program benefits . . . [T]he weight of the evidence suggests that these persons never accessed the purported membership benefits because they did not know they were deceived into enrolling." Id. at 44-45.

32.

Indeed, "the record was replete with testimony of Iowans over the age of sixty-five who testified they could not read important disclosures contained in Vertrue's marketing and program materials because their vision, compromised by old age, rendered the fine print illegible." Id. at 45. In all, Vertrue was assessed $40 million in restitution and fines for fraudulent mistreatment of Iowans.

33.

In 2009, Senator John Rockefeller launched an investigation into post-transaction marketing targeted at Vertrue as well as Affinion and Webloyalty, two other companies that

make use of "post-transaction" schemes that involve the unauthorized transmission of private credit card information and fraudulent billing. This investigation led to a hearing by the Senate's Committee on Commerce, Science, and Transportation. On November 16, 2009, the Committee released a staff report entitled "Aggressive Sales Tactics on the Internet and Their Impact on American Consumers" which has been attached as Exhibit A hereto. The Committee issued a "Supplemental Report on Aggressive Sales Tactics on the Internet" on May 19, 2010 which has been attached as Exhibit B hereto.

34.

"The November staff report and hearing explained in detail how . . . Vertrue . . . employed aggressive tactics to 'enroll' consumers in membership clubs and charge them monthly fees." See Exh. B, p. 1. The investigation determined that "Vertrue . . . knowingly charged millions of consumers for services the consumers [did] not use and [were] unaware that they [had] purchased." See Exh. A, p. iii. "Most consumers, even very web savvy consumers, [did] not clearly understand the" nature of Vertrue's "membership club offers and [did] not understand that they [could] be enrolled without entering their credit card numbers." Id. at 6.

35.

According to the November staff report, most Vertrue "savings club members" make no use of the clubs' services and have no idea that they are members. "Internal data and member surveys commissioned by . . . Vertrue . . . clearly show that the . . . compan[y] understand[s] that the majority of [its] paying 'members' have little or no awareness of their financial relationship with the compan[y]." See Exh. A, p. 18. A Vertrue document displaying "feedback from consumers who had visited one of its membership websites" showed that "[o]f the 'members' who completed the survey, 43% indicated that they were visiting to 'find about the charge on my

11

credit card that I did not recognize' and 44% indicated they were visiting 'to cancel the program.'" Id.  In fact, "[o]nly one member indicated he or she was there 'to find out more about my membership benefits' and none of the respondents were there 'to obtain my member ID.'" Id.  Traffic on Vertrue membership sites was incredibly low relative to the number of Vertrue subscribers, with web traffic "at best. . . represent[ing] only a small percentage (approximately 10-20%) of the total number of Vertrue club 'members.'" Id. at 23.

36.

Vertrue's "'customer service' operations are almost entirely dedicated to handling the large volume of calls from confused and angry customers requesting cancellations, and asking how the company obtained their credit card information." Id. at 17.  "Vertrue employees estimated that" Vertrue's call centers "received '7 million customer calls per year' and that 'cancellation calls represent approximately 98% of call volume.'" Id. at 21.

37.

The Senate committee concluded that "Vertrue . . . use[d] aggressive sales tactics intentionally designed to mislead online shoppers . . . [The] compan[y] exploit[ed] shoppers' expectations about the online purchasing process to charge millions of consumers each year for services the consumers do not want and do not understand they have purchased." See Exh. A, p. 30.

38.

The Senate investigation further concluded that the "data pass" system, though which consumers' credit card information was transmitted to Vertrue, "violated MasterCard and Visa's rules for credit card and debit card transactions." See Exh. B, p. ii.

39.

As a result of this Senate investigation, Congress enacted the Restore Online Shoppers' Confidence Act, 15 U.S.C. 8401, *et seq.*, which outlawed the "data pass" practice, and precluded "post-transaction third party sellers" like Vertrue from charging consumer credit or debit cards without clear and conspicuous disclosures of the material terms of the transactions and obtaining express informed consent.

C.   Vertrue Files for Bankruptcy But Continues to Impose Illicit Charges on Consumer Debit and Credit Cards.

40.

On April 2, 2012, after their deceptive business model was gutted by Congress and legal action, V2V, Vertrue, Adaptive Marketing, and numerous other Vertrue-affiliated companies petitioned the United States District Court for the Southern District of New York for Chapter 11 bankruptcy protection.

41.

According to the bankruptcy filings, Vertrue's business was thereafter put into "harvest" such that Vertrue ceased spending new marketing dollars to acquire new members and terminated its prior marketing partnerships with third parties. It continued, however, to charge the debit and credit cards of those "customers" who had previously unwittingly enrolled in its Membership Programs. Further, it did not cease other improper practices, such as transferring charges to new credit card numbers – ironically, such card number changes are often performed as a result of fraud on consumer accounts – and increasing monthly rates with no notice or authorization.

13

42.

Pursuant to the bankruptcy court's plan of reorganization, which became effective on February 4, 2013, ACU, LLC a new limited liability company owned by Vertrue's secured creditors, was formed to collect such future revenue and pay distributions pursuant to the plan.

43.

The bankruptcy plan of reorganization enjoins all parties from "taking any actions to interfere with the implementation or consummation of the [p]lan" and/or "prosecuting or asserting all Claims against the Reorganized Debtors and ACU LLC or their assets and properties."

44.

The bankruptcy court has ruled that this injunction does not preclude one from bringing claims relating to unlawful Vertrue conduct occurring "post-confirmation," or after February 4, 2013. In re Velo Holdings, Inc., 501 B.R. 188, 192-95 (S.D.N.Y. Bkrtcy. 2013) ("Even if [Vertrue] were only billing customers who enrolled prepetition, the Court never approved [Vertrue's] ongoing billing practices, which may run afoul of state deceptive practices law"); In re Velo Holdings, Inc., 500 B.R. 693, 698-700 (S.D.N.Y. Bkrtcy. 2013) ("Since claims arising from post-confirmation illegal conduct are not subject to discharge if they are new, independent acts, a claim that [Vertrue] ha[s] engaged in new deceptive practices would not have been discharged by the Plan or Confirmation Order").

45.

In 2013 and early 2014, Vertrue's representatives claimed that Vertrue would cease all business activity in August of 2014. As proven below, however, to this day Vertrue imposes unauthorized monthly charges on consumer debit and credit cards. It also continues to transfer

14

its billing to new credit card numbers without authorization and to increase the rate of monthly charges without notice or authority. These unlawful, post-confirmation practices have not been discharged.

<u>ALLEGATIONS SPECIFIC TO PLAINTIFFS</u>

A.    <u>Bruce and Kristine Bair.</u>

46.

Bruce and Kristine Bair are an elderly married couple who reside in Corpus Christi, Texas.

47.

In early January 2015, Mr. Bair was reviewing a statement from his and his wife's American Association of Retired Persons ("AARP") credit card account. He noticed a charge of $37.95 for "MVQ*SAVINGSACE."

48.

Mr. Bair did not recognize this charge and brought it to the attention of Mrs. Bair, who also did not recognize it.

49.

Mr. Bair contacted Vertrue to investigate the "SavingsAce" charge and determine why he had been charged. He quickly discovered that neither he nor his wife had authorized the "SavingsAce" charge and they did not want, nor need to be enrolled in the Membership Program.

50.

Mr. Bair informed Vertrue of these facts and demanded that it remove him from the Membership Program. The call center operator agreed to do so.

51.

Mr. Bair thereafter contacted the issuer of his card – Chase Bank – to provide notice of the unauthorized charge.  During his communications with Chase, Mr. Bair was sickened to discover that his card had been assessed monthly "SavingsAce" charges since November 2010, a period of approximately *four years*.

52.

The Bairs both use the credit card account and neither Bair had ever thought to ask the other what "SavingsAce" was, despite routinely reviewing their credit card statements.  They often used their AARP card to make a wide variety of purchases, including internet purchases, so these charges did not appear out of place to them.

53.

These monthly charges were initially $19.95, but rose to $23.95, then to $27.95, then to $32.95, and eventually to $37.95.  In all, Mr. and Mrs. Bair's credit card was charged at least 48 times by Vertrue in a total amount exceeding $1,200.00.

54.

Since February 4, 2013, Mr. and Mrs. Bair's AARP credit card information changed, yet the charges persisted, meaning Vertrue found a way to charge their card without contacting the Bairs to obtain their new card information.  The Bairs did not authorize any charges against their new account number.  Further, they never authorized any monthly rate increases, but Defendants raised the monthly rates at least four times anyway.

55.

Vertrue's practices were at odds with legitimate merchants with whom the Bairs contracted, which notified them that their credit card information would soon be expiring and asked them to update the information so as not to experience a service disruption.

56.

Prior to January 2015, neither of the Bairs have any recollection of ever communicating with Vertrue, via the internet, email, telephone, or otherwise. They never received nor used any benefit from the SavingsAce Membership Program in which they had been unknowingly enrolled.

57.

Mr. and Mrs. Bair were reasonably concerned that Vertrue might continue imposing unauthorized charges, so they cancelled their AARP card, even though by doing so they forfeited the substantial reward points they had accumulated and incurred a negative mark on their credit report.

58.

To this day, the Bairs are uncertain how they became enrolled in the SavingsAce Membership Program. They learned through internet research that Vertrue previously partnered with Travelocity, a site they have used in the past to purchase airline tickets.

59.

Upon review of prior credit card statements, they learned that the Vertrue "SavingsAce" charges started within one month after they purchased an airline ticket from Travelocity. Based on this information, it appears they became enrolled in conjunction with this purchase.

60.

While they gave their credit card information to Travelocity in conjunction with the airline ticket purchase, they did not give it to Vertrue as they had no use for Vertrue's so-called services.

61.

The Bairs do not assert claims against Vertrue for any charges predating February 4, 2013 (the date of bankruptcy discharge), but rather base their claims on the unauthorized charges assessed by Vertrue after that date.

B.     John and Paula Young.

62.

John and Paula Young are an elderly, married couple who reside in Vienna, Virginia.

63.

In late January 2015, Mr. Young noticed a charge on his and his wife's credit card statement for a company called "Passport to Fun."

64.

Mr. Young did not recognize this charge and brought it to the attention of Mrs. Young, who also did not recognize it.

65.

Mr. Young contacted Vertrue to investigate the "Passport to Fun" charge.  He was told that it was a Membership Program in which he had enrolled by clicking on an icon in conjunction with a purchase of airline tickets from Travelocity on September 5, 2009.

66.

To his horror, Mr. Young discovered that Vertrue had charged his card more than $1,800.00 in monthly "membership" fees since 2009.

67.

Mr. Young demanded that Vertrue stop charging his card immediately and the call center operator agreed to do so.  Mr. and Mrs. Young subsequently received a cancellation notice via email.

68.

The Youngs both use the credit card at issue.  Each of them never thought to ask the other about the Vertrue charges, despite routinely reviewing their credit card statements.  They often used their card to make a wide variety of purchases, including travel and internet-based purchases, and the Vertrue charges did not appear out of place to them.

69.

Since February 4, 2013, Mr. and Mrs. Young's credit card number has changed, yet the Vertrue charges persisted, meaning Vertrue found a way to charge their card without contacting the Youngs to obtain their new card information.  The Youngs never authorized charges against their new card number.  Further, they never authorized any monthly rate increases by Vertrue. Nevertheless, Vertrue increased the amount of the monthly charge on multiple occasions.

70.

Vertrue's practices were at odds with legitimate merchants with whom the Youngs contracted, who notified them that their credit card information would soon be expiring and asked them to update the information so as not to experience a service disruption.

19

71.

Prior to January 2015, neither of the Youngs have any recollection of ever communicating with Vertrue, via the internet, email, telephone, or otherwise. They never received nor used any benefits from the Passport to Fun Membership Program in which they had been unknowingly enrolled.

72.

The Youngs never provided Vertrue or Passport to Fun with their credit card information, nor did they knowingly give them authorization to charge their credit card.

73.

The Youngs do not assert claims against Vertrue for any charges predating February 4, 2013 (the bankruptcy discharge date), but rather base their claims on the unauthorized charges assessed by Vertrue after that date.

CLASS ALLEGATIONS

74.

Plaintiffs bring this action pursuant to O.C.G.A. § 9-11-23, on behalf of themselves and a class preliminarily defined as follows:

> All persons in the United States who incurred a charge on a debit or credit card after February 4, 2013 for a Vertrue Membership Program in which they were enrolled while completing an online sales transaction with a Vertrue Marketing Partner.

75.

Excluded from the Class are all persons who make a timely election to be excluded, Defendants and their legal representatives, officers, assignees, and successors, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

76.

Plaintiffs reserve the right to modify or amend the Class definition before the Court determines whether certification is appropriate.

77.

**Numerosity** – The Class members described above are so numerous that joinder of all members by name in one action is impracticable. Vertrue is a multimillion-dollar conglomerate that had post-transaction marketing arrangements with numerous online retailers and social networking sites for many years. Consequently, Vertrue's practices have harmed at minimum many tens of thousands of consumers across the country. All injuries sustained by any Class member arise out of the conduct of Defendants as described herein.

78.

**Commonality and Predominance** – Important questions of law and fact exist which are common to all Plaintiffs and Class members and predominate over any questions that may affect them individually. All Plaintiffs and Class members were the targets of, and were victimized by, the same deceptive practices on the part of Defendants, and there are no significant individual issues that would become the focus of the action. Furthermore, common questions of law and fact include, but are not limited to, the following:

  a. Whether Defendants failed to obtain proper authorization from Plaintiffs and Class members before assessing charges on their debit and credit cards, before shifting charges onto new credit card numbers, and before increasing the amount of monthly charges;

  b. Whether Defendants did not sufficiently alert Plaintiffs and the Class members to the monthly charges they imposed on their debit and credit cards;

c.   Whether Defendants designed and implemented policies to conceal the fact that Plaintiffs and the Class members were enrolled in Vertrue Membership Programs;

d.   Whether Defendants' Membership Programs provided any tangible benefit to Plaintiffs and the Class members;

e.   Whether Defendants designed and implemented policies to avoid issuing refunds to Plaintiffs and the Class members;

f.   Whether Plaintiffs and Class members are entitled to injunctive and/or declaratory relief;

g.   Whether Defendants were unjustly enriched at the expense of Plaintiffs and the Class members;

h.   Whether Defendants are liable to Plaintiffs and the Class members for money had and received; and

i.   Whether Defendants violated the consumer protection acts of certain states.

79.

**Typicality** – The claims of the Plaintiff representatives are typical of the claims of the Class members because, among other things, all Plaintiffs and Class members were comparably injured through the uniform misconduct alleged herein, and were subject to Defendants' scheme to enroll consumers in the Membership Programs and to cause them to incur unauthorized charges on their credit card and/or debit card accounts.

80.

**Adequacy of Representation** – Plaintiffs will fully and adequately represent and protect the interests of the entire Class because of the common injuries and interests of the Class Members and the uniform conduct of Defendants as to all Class Members.   Plaintiffs have

retained counsel competent and experienced in the prosecution of class action litigation. Plaintiffs have no interests that are contrary to or in conflict with those of the Classes they seek to represent.

81.

**Superiority** – A class action is superior to all other available methods for fair and efficient adjudication of this controversy. There is no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. The damages or other financial detriment suffered by Plaintiffs and other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claim against Defendants, so it would be impracticable for the Class members to individually seek redress for Defendants' wrongful conduct. Even if the Class members could afford individual litigation, the prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications concerning the subject of this action, which adjudications could establish incompatible standards for Defendants under the laws alleged herein.

82.

**Refusal to Act** – Defendants have refused to act to correct the obvious deficiencies described above and have refused to make their victims whole. Moreover, they continue to take drastic action to harm the Class members by continuing to impose unauthorized, unknown charges on their debit and credit cards. As such, injunctive relief or corresponding declaratory relief with respect to the Class as a whole is appropriate to put an end to these improper practices.

## COUNT I
## Declaratory and Injunctive Relief

83.

Plaintiffs incorporate by reference the allegations in all prior paragraphs as if set forth verbatim herein.

84.

Class-wide injunctive and/or declaratory relief is appropriate where Defendants have acted or refused to act on grounds generally applicable to the Class.

85.

Defendants have taken money from Plaintiffs and the Class members in the form of outrageous recurring charges in exchange for "services" for which the consumers did not even know they were enrolled and from which they have received no tangible benefits.

86.

Defendants have done so under the auspices of fine print terms that were allegedly presented to Plaintiffs and the Class members in conjunction with a legitimate purchase they made from one of Vertrue's e-merchant Marketing Partners. Even if this fine print was shown to Plaintiffs and the Class members, however, it was done so in a manner that led them to reasonably believe they were not agreeing to incur future financial obligations.

87.

As such, there was no "meeting of the minds" or mutual assent between Defendants and Plaintiffs and the Class members with respect to the "fine print" terms and conditions and thus no contract between the parties was ever formed. None of the other norms of contract law were present, such as offer-and-acceptance, mutual assent, negotiation, and consideration.

88.

Alternatively, even if the parties had *both* voluntarily agreed to the "fine print" terms and conditions, the terms and Defendants' associated policies and practices are procedurally and substantively unconscionable. Indeed, considering the great business acumen and experience of Defendants in relation to Plaintiffs and the Class members, the great disparity in the parties' relative bargaining power, the inconspicuousness, incomprehensibility, and commercial unreasonableness of the terms at issue, the oppressiveness of the policies and practices, the allocation of the risks between the parties, and similar public policy concerns, these terms and practices are unconscionable and, therefore, unenforceable as a matter of law.

89.

The Court should use its declaratory and equitable powers to declare that the parties do not have an enforceable agreement or, in the alternative, that the terms and conditions are unenforceable.

90.

Furthermore, injunctive relief is appropriate to enjoin Defendants from imposing future charges for Vertrue Membership Programs on the debit and/or credit cards of the Class members, at least until Vertrue obtains express informed consent that a Class member authorizes such charges. Even if the Court were not to enjoin all charges, it should enjoin Vertrue from shifting charges to new credit or debit card numbers without express authorization. Further, Defendants should be stopped from increasing the monthly rate of their charges without express authorization.

91.

Defendants have shown themselves unwilling to obtain such consent prior to charging the Class members for "services" it knows, or should know, such individuals do not even realize they are paying for.

92.

The Court should use its equitable and injunctive authority to bring an end to the ongoing harm being suffered by the Class members.

## COUNT II
### Unjust Enrichment

93.

Plaintiffs incorporate by reference the allegations of all prior paragraphs as though fully set forth herein.

94.

As a result of Defendants' fraudulent, deceptive, and unlawful conduct, Plaintiffs and the Class members have conferred benefits upon Defendants in the form of unauthorized recurring, monthly payments for Vertrue's Membership Programs.

95.

Defendants were at all times aware that the benefits conferred upon them by Plaintiffs and Class members were the result of Defendants' fraudulent, deceptive, and wrongful conduct.

96.

Allowing Defendants to retain these unjust profits and other benefits would offend traditional notions of justice and fair play. Under these circumstances, it would be inequitable for Defendants to retain the benefits, and allowing them to do so would induce companies to

fraudulently conceal, mislead, and/or misrepresent key characteristics and obligations of their products in order to increase sales and profit.

97.

Plaintiffs, on behalf of themselves, and all others similarly situated, seek restitution from Defendants and an order of this Court proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct, in an amount to be proven at trial.

## COUNT III
## Money Had and Received

98.

Plaintiffs incorporate by reference the allegations of all prior paragraphs as though fully set forth herein.

99.

By the aforesaid actions, Defendants have received and are holding funds belonging to Plaintiffs and the Class members, which in equity and good conscience Defendants should not be permitted to keep but should be required to refund to Plaintiffs and the Class members.

100.

Plaintiffs demand, on behalf of themselves and all Class members, that Defendants repay the amounts they have collected from Plaintiffs and the Class members in conjunction with the fraudulent scheme outlined herein.

101.

Defendants have refused and continue to refuse to repay those funds to Plaintiffs and the Class members.

27

102.

Defendants are liable to Plaintiffs and the Class members for money had and received, in an amount to be proven at trial.

## COUNT IV
### Violation of Virginia Consumer Protection Act

103.

Plaintiffs incorporate by reference the allegations of all prior paragraphs as though fully set forth herein.

104.

This claim is asserted on behalf of John and Paula Young and those Class members who reside in Virginia ("the Virginia Subclass").

105.

Defendants engage in fraudulent, deceptive, and unfair practices in connection with consumer transactions in violation of the Virginia Consumer Protection Act, Va. Code Ann. § 59.1-196 *et seq.* For example, the wrongful conduct described herein violates §§ 59.1-200(A)(2) (misrepresenting the approval of services), (A)(11) (using bills or invoices in conjunction with a misrepresentation), and (A)(14) (using any deception or fraud in connection with a consumer transaction). In addition to improperly charging consumer accounts without authorization, Defendants have shifted charges onto new account numbers and increased the amount of monthly charges without notice or approval.

106.

As redress for Defendants' repeated and ongoing violations of the Virginia Consumer Protection Act, Plaintiffs John and Paula Young and the Virginia Subclass are entitled to

28

injunctive relief, declaratory relief, actual damages or statutory damages (whichever is greater), reasonable attorneys' fees, and court costs.

## COUNT V
### Violation of Texas Deceptive Trade Practices Act

107.

Plaintiffs incorporate by reference the allegations of all prior paragraphs as though fully set forth herein.

108.

This claim is asserted on behalf of Bruce and Kristine Bair and those Class members who reside in Texas ("the Texas Subclass").

109.

Defendants engage in false, misleading, and deceptive consumer practices in violation of the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code Ann. § 17.41 *et seq.* For example, the wrongful conduct described herein violates § 17.46(b)(2) (causing confusion as to the approval of services).

110.

Defendants' actions are also unconscionable in violation of § 17.50(3) because Defendants took advantage of Plaintiffs and the Texas Subclass' lack of knowledge, ability, experience, and/or capacity to a grossly unfair degree and the resulting unfairness was glaringly noticeable, flagrant, complete, and unmitigated.

111.

For example, based on their failure to ever use any of the "benefits" offered by the Membership Programs as well as Defendants' failure to communicate with them regarding the Programs, Defendants knew or had reason to know that the Bairs and the Texas Subclass did not

29

even realize they were enrolled in the Programs. Yet, Defendants continued to bill these individuals in a manner that was calculated to continue to keep them in the dark. Further, Defendants have shifted charges onto new account numbers and increased the amount of monthly charges without any authorization.

112.

As redress for Defendants' repeated and ongoing violations of the Texas Deceptive Trade Practices Act, Plaintiffs Bruce and Kristine Bair and the Texas Subclass are entitled to injunctive relief, declaratory relief, actual damages, mental anguish damages, restitution,, reasonable attorneys' fees, court costs, and any other relief authorized by statute that the Court deems proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.  For an order certifying this action as a class action on behalf of the Class and Subclasses described above, appointing Plaintiffs as the Class and Subclass representatives, and designating their counsel as counsel for the Class and Subclasses;

B.  For restitution and/or disgorgement of all amounts wrongfully charged to and received from Plaintiffs and the Class members;

C.  For damages according to proof;

D.  For an award of treble and mental anguish damages where permitted under applicable law;

E.  For an award of punitive damages where permitted under applicable law;

F.  For declaratory relief as described herein;

30

G.      For preliminary and permanent injunctive relief as described herein;

H.      For an award of reasonable attorneys' fees;

I.      For costs of suit herein incurred;

J.      For both pre- and post-judgment interest on any amounts awarded;

K.      For a trial by jury; and

L.      For such other and further relief as the Court may deem proper.

DATED this 13th day of February, 2014.

Respectfully submitted,

BY:     WEBB, KLASE & LEMOND, LLC

E. Adam Webb
  Georgia State Bar No. 743910
Matthew C. Klase
  Georgia State Bar No. 141903

1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
(770) 217-9950 (fax)
Adam@WebbLLC.com
Matt@WebbLLC.com

Attorneys for Plaintiffs

31